Pee Curiam:
This case was referred to Trial Commissioner Richard Arens with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on October 11, 1965. Exceptions to the commissioner’s opinion and report were filed by plaintiff and defendant requested that the court accept the report and opinion of the commissioner. The case was submitted to the court on the briefs of the parties and oral argument of counsel. Such facts as are necessary to the decision of the case are found in the commissioner’s opinion. Since the court is in agreement with the opinion and report of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover and its petition is dismissed.
OPINION OF COMMISSIONER*
Arens, Commissioner: This case arises out of a broker’s contract entered into between the General Services Administration (hereinafter referred to as GSA) and plaintiff with respect to the sale of a Government-owned industrial plant which was constructed with Government funds during World War II at New Castle, Pennsylvania. After a denial by the contracting officer of plaintiff’s claim under the disputes clause of the contract for commissions and reimbursement of expenses, plaintiff appealed to the GSA Board of Contract Appeals which conducted a hearing and thereafter denied the appeal.[1]
In this court, plaintiff, relying exclusively on the administrative record, seeks by way of an assignment of errors to overturn the Board’s decision. In the alternative, plaintiff seeks quantum meruit recovery for expenses and the fair value of its services, or damages for alleged breach of contract.
The entire administrative record is voluminous and contains numerous exhibits, but only those facts are herein recited which are necessary to decide the issues presented.
*390 The industrial plant which was the subject of the broker’s contract was at all pertinent times until the spring of 1954 leased to and operated by United Engineering & Foundry Company (hereinafter referred to as United). As successor to the War Assets Administration, USA had assumed custody and accountability for the plant, subject to United’s lease. During its lease occupancy, United discussed with GSA from time to time the purchase of the plant, but the parties were never able to get together on a sale.
On February 10, 1955, GSA and plaintiff entered into a broker’s contract in which plaintiff was designated the exclusive contract sales'broker of the plant until August 8,1955. Plaintiff agreed to exert its best efforts to obtain purchasers for the plant which had been declared Government surplus property, “to assist in closing the transaction after an offer to purchase has been accepted,” and to expend an amount not exceeding $10,000 in promoting and advertising the plant for sale. The contract provided a sliding scale for payment by GSA to plaintiff of a commission, depending upon the sales price. The commission was to “be payable after closing of title and delivery of the closing papers, resulting from any offer or offers accepted” through plaintiff by GSA during the term of the contract, “even though the sale or sales may not be consummated until after the expiration” of the contract. The contract also provided that “where a sale is consummated by the closing of title and delivery of the closing papers as the result of an offer not submitted by or through” plaintiff, the commission shall be payable to plaintiff “only if the offer is accepted during the term” of the contract.
Plaintiff agreed “that any offer to purchase must be accepted” by GSA “before any binding commitment” on behalf of GSA could be made. The sale was to be “subject to prior clearance with the Government Operations Committees of the Senate and the House of Representatives and, where appropriate, with the Antitrust Division of the Department of Justice.” The contract contained a disputes clause in conventional form. Finally, it was provided that all services rendered by plaintiff and amounts expended by it in the performance of the contract were to be at plaintiff’s own expense, unless GSA terminated the contract if it became necessary *391 to withdraw the plant from the market for use of the United States, in which event plaintiff was to be reimbursed for all reasonable direct out-of-pocket expenses incurred.
Plaintiff was informed of the GSA appraised value of the plant at $13,200,000, and was given a listing price of $14,520,000. Plaintiff immediately began to elicit the interest of potential purchasers by letters, advertising, and personal contacts. On plaintiff’s request, a sealed-bid sale procedure was approved by GSA but the only bid received was a bid of $4,500,000, made on August 5, 1955, by United and rejected by GSA on August 15, 1955, as inadequate. In the meantime, plaintiff asked for an extension of its broker’s contract, but was advised by GSA that the contract would not be extended or renewed.
Plaintiff’s further efforts to secure an extension or renewal of its contract were unavailing, but plaintiff was requested verbally by the GSA Administrator “to keep on trying to get a better price for GSA.” Plaintiff continued to deal with United which, in September 1955, told plaintiff that it preferred to negotiate directly with GSA and “was opposed to entering into any sales commission commitments for the purchase and/or sale of the plant.”
Thereafter, for the next 3 or 4 months, GSA and United negotiated on the sale of the plant. During the negotiations, United was told by GSA that the Government reserved the right to cancel a proposed sale in the event the Attorney General failed to advise that the proposed sale would not tend to create or maintain a situation inconsistent with the antitrust laws or if either of the Congressional Committees on Government Operations interposed objection. Finally, by letter of January 16,1956, United restated an offer which it had previously made to buy the plant for $7,459,203.92, plus $2,540,-796.08 as interest, payable in 20 annual installments.
At the hearing before the GSA Board of Review, Mr. Edmund Mansure, who was the GSA Administrator from May 2, 1953, until March 1, 1956, stated, in effect, that he accepted the offer of United, subject to adverse comment from the Attorney General or from the committees.
By letter dated January 19, 1956, the Director of GSA’s Real Property Disposal Division advised United “that the *392 Administrator had directed preparation of a report to the Congressional committees which would outline the disposal history of the plant and include a copy of United’s final offer with a statement that unless adverse comment was received from the committees, or from the Attorney General respecting antitrust clearance, sale to United on the terms of such final offer would be accepted.”
On January 25, 1956, United acknowledged the letter and expressed its understanding that there was nothing further for it to do until additional advice was received from GSA.
By letter of February 6,1956, GSA sent a copy of United’s offer and “an explanatory statement of the proposed sale” to the Congressional Committees, and concluded with the statement that “action to consummate the sale will be taken after 30 days from the date of this letter unless objection thereto- is interposed by either Senate or House Committee.” On February 16, 1956, the Chairman of the House Committee replied, stating that if the sale was a negotiated sale, consummation thereof had no statutory authorization because of expiration by limitation of the Act permitting disposal through negotiation; but, that the Committee would make no recommendations for or objections to such sale pursuant to the explanatory statement furnished. On February 28,1956, another letter was received by the GSA Administrator from the Chairman of the House Committee wherein the Administrator was advised that the February 16,1956, letter was not intended to preclude entertainment by the Committee of such legal justification as GSA might have for the proposed negotiated sale, and that it would seem appropriate for GSA’s justification to be received and reviewed by the Committee prior to the consummation of any pending sale.
On March 2,1956, objections to the proposed sale to United were voiced by an alleged competitor at a meeting conducted by the staff of the Senate Committee on Government Operations. United referred to this in a letter to the GSA Administrator, but expressed the hope that it might look forward to an early consummation of its offer.
Meanwhile, the Attorney General, by letter of February 1, 1956, had advised GSA that the proposed sale to United did not tend to create or maintain a situation inconsistent with *393 the antitrust laws; but, on March 2, 1956, he requested GSA to withhold consummating the sale pending study of new information which had reached the Department of Justice.
In March 1956, the GSA Administrator who had dealt with plaintiff resigned. Since the 1 aw authorizing negotiated sales had expired, the new Administrator advised United that he would re-advertise the plant for an auction sale, which was held in April 1956, at which time United was out bid by Mesta Machine Company to which the plant was then sold. In the meantime, the new Administrator withdrew the earlier submissions covering the proposed sale to United. At no time did United contend that the proposed sale to it by GSA was completed.
Plaintiff’s position in this court is that: (1) although its written broker’s contract expired on August 8, 1955, the verbal request to plaintiff by the GSA Administrator “to keep on trying to get a better price for GSA” constituted an extension of the contract, (2) the subsequent offer of United was accepted by GSA and, hence, there was a binding contract between the Government and United, and (3) plaintiff was the “procuring cause” of a sale on terms acceptable to GSA. Plaintiff cites a number of cases to the effect that a broker who procures a purchaser ready, willing, and able to purchase on terms acceptable to the seller is entitled to a commission; and, that a broker is the “procuring cause” of a sale when he produces a purchaser ready, willing, and able to purchase on terms satisfactory to the owner, even though the sale may not be consummated.
Without ruling on plaintiff’s position (concerning which no authority is cited) that the broker’s contract was extended by oral agreement, it is clear that plaintiff’s case fails because the “prior clearance” (prescribed in the broker’s contract) with the designated Congressional Committees and the Department of Justice did not come to pass. Within 30 days of the submission by the GSA Administrator to the Committees and to the Attorney General of “an explanatory statement of the proposed sale,” the Attorney General requested GSA to withhold consummating the sale pending study of new information which had reached the Department. This could only be construed as a suspension or revocation, *394 witbin the 30-day period, of the “prior clearance” by the Attorney General. It is doubtful if the first letter of the Chairman of the House Committee could be construed as an unqualified “prior clearance,” because the Chairman pointed to what he regarded as a lack of statutory authority for the sale. Moreover, the Chairman’s second letter, within the 30-day period, stated that it would seem appropriate for GSA’s justification for a negotiated sale to be received and reviewed by the Committee prior to the consummation of any pending sale. The Chairman’s second letter, though worded softly, was certainly not a “clearance” for the proposed sale. There is, moreover, no record of a “prior clearance” by the Senate Committee. The only reference in the record to the Senate Committee after the submission of the explanatory statement by the GSA Administrator is the incident of the objections to the proposed sale, voiced by an alleged competitor at a meeting conducted by the Staff of the Committee. Neither GSA, United, the House Committee nor the Attorney General regarded the sale to United as consummated. It was only “proposed” or “pending” and it is reasonable to conclude that the conduct of at least the House Committee and the Attorney General constituted polite objections to a consummation of the sale at that time.
It is concluded, therefore, that the GSA Board of Contract Appeals was correct in its ruling that GSA never finally accepted United’s offer and thus could not have repudiated any contract with United since none had ever come into being. Although in its opinion the Board also stated that plaintiff failed to show that it was the “procuring cause” of a sale on terms acceptable to GSA, it becomes unnecessary to consider this aspect of the case because there was no “prior clearance” for the “proposed” sale. For the same reason, it is apparent that there is no basis for plaintiff’s claim in the alternative for damages for breach of contract.
We come then to plaintiff’s theory that it should, in any event, be entitled to quantum meruit recovery for expenses and the fair value of its services. This court has consistently held that there can be no recovery on the theory of quantum meruit where there is a valid express contract between the *395 parties. National Trailer Convoy, Inc. v. United States, 170 Ct. Cl. 823, 345 F. 2d 573 (1965). In tlie instant case, assuming arguendo, as plaintiff contends, that the written contract was extended by oral agreement, plaintiff was entitled to a commission (or expenses) only upon the happening of events which did not occur.[2] If, on the other hand, there was no extension of the written contract, plaintiff has failed in proof of services rendered to defendant or expenses incurred in connection with services rendered to defendant for which it could be entitled to quantum meruit recovery.
CONCLUSION OF LAW
Upon the foregoing opinion which includes therein the findings of fact made by the court as a part of its judgment herein, the administrative record and briefs of the parties and for the reasons stated above, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed.

The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 57(a). The facts are stated in the opinion.

 Docket No. 419, decided June 26, 1963.

 Plaintiff makes no claim for a commission on the sale of the plant to Mesta Machine Company.