**CLEARWATER FOREST INDUSTRIES, INC.**

v.

**The UNITED STATES**

No. 509–76.

United States Court of Claims.

May 6, 1981.

Before DAVIS, NICHOLS and KASHI-WA, Judges.

## OPINION

### PER CURIAM:

This timber sale case, tried before Trial Judge Wood, involves a Forest Service "deficit" timber sale, a concept new to this court and apparently new to plaintiff Clearwater Forest Industries, Inc. After trial, Trial Judge Wood held that plaintiff is not entitled to recover. In Part A, *infra*, we adopt and set forth the bulk of his opinion, with minor modifications by the court. In Part B, *infra*, we supplement the trial judge's opinion with a discussion of some points particularly stressed by plaintiff in its written and oral contentions urging us to reject the trial judge's conclusions. The court's opinion consists of both Part A and Part B. Plaintiff cannot recover.[1]

### PART A *

#### I

On June 9, 1975, plaintiff, a Delaware corporation, and defendant, acting through the Acting Forest Supervisor, Nezperce National Forest, Region One, Forest Service, United States Department of Agriculture, entered into Timber Sale Contract No. 17–01386–3 ("the Big Burn contract" or the "Big Burn timber sale"). Pursuant to that contract, defendant agreed to sell, and plaintiff agreed (among other things) to purchase, cut, and remove "Included Timber".

The Big Burn timber sale had been proposed in 1970 and entered on the Clearwater Ranger District's 5-year sales program; the proposed sale was scheduled for sale in fiscal year 1975 with an estimated volume of 5,000 MBF (thousand board feet). A major portion of the proposed sale area had been previously logged.

James F. McAteer, Seattle, Wash., atty. of record, for plaintiff; Lenihan, Ivers & McAteer, Seattle, Wash., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant; Velta A. Melnbrencis and James P. Perry, Washington, D. C., of counsel.

---

1. The court adopts but does not print the trial judge's findings of fact.

* This Part A incorporates the bulk of the trial judge's opinion, with minor modifications.

Prior to and at the time of advertisement of the proposed Big Burn timber sale, market conditions were depressed, and appraisal data indicated that the proposed sale would be a deficit sale. Where an appraisal develops less than 75 percent of normal profit, before the Forest Service can advertise the prospective timber sale, a prospective purchaser must request in writing that the sale be advertised. In April 1975, after Forest Service notification to several prospective purchasers, plaintiff requested that the proposed Big Burn timber sale be advertised as scheduled.

Prior to June 9, 1975, the Forest Service provided to prospective purchasers, including plaintiff, an advertisement, a prospectus, and a bid form concerning the proposed Big Burn timber sale.

Among other things, the advertisement (as amended prior to June 9, 1975) stated in substance that the proposed sale involved an estimated 4,690 MBF of timber; that applicable purchaser road credits were $166,194;[2] that the sale was "in deficit"; and that full information concerning the timber, the conditions of sale, and the submission of bids should be obtained from the District Ranger, Clearwater Ranger District, or the Forest Supervisor.

The phrase "in deficit" indicated to prospective purchasers that the proposed sale did not have sufficient value to realize a normal profit as calculated under the Forest Service's appraisal system. When a proposed timber sale is "in deficit", the proposed contract contains no payment mechanism for recovery of estimated road construction costs at advertised rates; a prospective purchaser has apparently to decide whether or not the sale is economically feasible in order to recover his operating costs.

Among other things, the Big Burn timber sale prospectus advised prospective purchasers that the sale area, and a sample contract, should be inspected before submitting a bid; that the quality, size, and age class of the timber involved were estimates based on detailed cruise information available for inspection at the Forest Service's office in Grangeville, Idaho; that values shown were not estimates of a purchaser's own recovery, and were not a part of the proposed contract; and that for these reasons bidders were urged to examine the timber sale area and make their own recovery estimates.

The prospectus further stated that the minimum acceptable bid rate had been established by appraisal as though roads specified by the proposed contract (described hereinafter) were in place, and that applicable purchaser credit up to the amount shown in the advertisement (*i. e.*, $166,194) would be credited to the purchaser's timber sale account as the specified roads were constructed and accepted; that purchaser credit might be applied only to timber charges in excess of timber value at base rates;[3] and that "it is estimated that there will be $166,194.00 insufficient value of timber at advertised rates to permit purchasers to recover the total estimated cost of specified road construction."[4]

Prospective bidders were further informed by the prospectus that Forest Service construction engineering for specified roads on the Big Burn sale would be completed after sale award;[5] that approximately 2.8 miles of construction, and 4.4 miles of reconstruction, of specified roads would be required; that construction estimates for such roads were not guaranteed; and that the information in the prospectus, "together with related material, is made available with the understanding that costs or quantities shown are estimates."

---

2. For a general explanation of purchaser road credits, *see Timber Investors, Inc. v. United States,* 218 Ct.Cl. ——, 587 F.2d 472 (1978).

3. The Big Burn timber sale was advertised at base rates which were required to be paid in cash.

4. Put another way, the dollar amount of the value of timber estimated to be available at advertised rates for the full recovery of the estimated cost of specified road construction was zero.

5. The prospectus listed the scheduled dates for completion of such engineering as subsequently stated in the Big Burn contract.

As noted above, plaintiff was awarded the Big Burn timber sale June 9, 1975. There is no evidence whatever that any of the governmentally authored provisions of the Big Burn contract departed in any way from the information available prior to June 9, 1975, to prospective timber purchasers (including plaintiff) from the Forest Service's advertisement, prospectus, and sample timber sale contract for the proposed Big Burn timber sale.

By way of summary of the relevant contractual provisions, Section A2, "Volume Estimate * * *", indicated a total "Estimated Quantity" of sawlogs of 4,690 MBF, with the largest single species (grand fir) having an estimated quantity of 2,340 MBF; Section A5a, "Timber Payment Rates * * * for Species * * * to be Paid for at Rates Escalated under B3.2", contained base and advertised rates per MBF (in this case identical in amounts as to each species, although not identical for all species), plaintiff's "Bid Premium" rates (ranging from a high of $17 per MBF for grand fir to a low of $15 per MBF for ponderosa pine), a "Bid (Tentative)" rate [6] for each species subject to quarterly adjustment for escalation under Section B3.2, and a base index for each species.[7]

Section B2.4, "Volume Estimate", stated that "The estimated volumes of timber by species designated for cutting * * * and expected to be cut * * * are listed in A2." Section B2.4 unambiguously added, however, that "the estimated volumes stated in A2 are not to be construed as guarantees or limitations of the timber volumes to be designated for cutting under the terms of this contract."

Section B3.2 provided an "Escalation Procedure" with respect to the Bid (Tentative) rates for each species listed in Section A5a. Under the terms of Section B3.2, those rates were subject to escalation in the following amounts (in dollars per MBF):

| Species | Difference Between Base and Bid (Tentative) Rates | Maximum Escalation Increase |
|---|---|---|
| Grand Fir | 17.00 | 17.00 |
| Larch | 16.00 | 16.00 |
| Englemann Spruce | 16.00 | 16.00 |
| Ponderosa | 15.00 | 15.00 |
| Douglas Fir | 16.00 | 16.00 |
| Lodgepole Pine | 16.00 | 16.00 |
| Cedar | 16.00 | 16.00 |

Under Section B4.21, "Purchaser Credit", effective (or usable) purchaser credit was defined as "unused Purchaser Credit which does not exceed Current Contract Value minus * * *" the sum of the products of Base Rates and estimated remaining unscaled volumes by species of Included Timber meeting Utilization Standards. Any earned purchaser credit in excess of current contract value minus base rate value was unusable or ineffective, i. e., unavailable to apply to stumpage payments.

The Big Burn contract expressly limited charges against purchaser credit to timber values in excess of base rates, or, in this instance (and without escalation) $76,500. Since the maximum escalation possible under Section B3.2 was $76,500, the maximum amount available (given maximum escalation) for recovery, by way of purchaser credit, of road cost estimates, was $153,000. Each of the figures stated in this paragraph is based upon a cutout, for each species, of the estimated quantity for that species listed in Section A2.

The Big Burn contract required that plaintiff reconstruct 4.4 miles of existing road and construct 2.8 miles of new road. As the prospectus had indicated it would, that contract called for post-sale engineering and design of specified roads. The date specified for completion of road engineering design and specifications was June 30, 1976, more than a year after contract award. The contract also provided that where the Forest Service completed road design during the contract, the estimated costs and purchaser credit limit stated in Section A10

---

6. Bid rates were defined as the sum of advertised rates and bid premium rates. Use of the word "(Tentative)" indicated that the bid rate would be subject to quarterly adjustment under Section B3.2.

7. The base indices were to be taken into account in computing adjustment in rates for variance in product selling value as provided in Section B3.2.

would be revised, with the methods of computing such revised costs to be consistent with the methods that would have been used had the engineering been performed prior to sale advertisement.[8] There was, however, no provision in the contract for a concomitant revision of Section B4.21, defining (and limiting the amount of) "*effective* purchaser credit" (emphasis supplied) as indicated hereinabove.

As of 1975, plaintiff was quite experienced in Forest Service timber sale contracts but not so experienced in "deficit" contracts. When plaintiff decided to bid on the Big Burn contract, it knew that the specified roads it would be required to construct (or reconstruct) if awarded that contract had not yet been designed, and that they would not be completely designed for more than a year after June 9, 1975. It knew that on completion of road design Section A10 would be revised, as to both estimated costs and purchaser credit limit, and that in the event of specified differences, or of physical or design changes, appropriately adjusted changes in the Big Burn contract's estimated construction costs and purchaser credit limit would also be made.

Plaintiff also then knew, however, that the maximum possible effective purchaser credit under that contract (calculated using plaintiff's bid premiums, and assuming cut-out for each species of the estimated quantity for that species listed in Section A2, together with maximum escalation), was $153,000. And, it knew that if the actual cost of road construction equaled or exceeded the then specified estimated cost of road construction, such cost would exceed that maximum possible effective purchaser credit of $153,000 by $13,194 or more.[9]

Plaintiff was also aware that under the terms of the contract, and absent modification of the contract ceiling on escalation or an overrun in the estimated volume of timber included in the Big Burn timber sale, any post-engineering increases in the estimated cost of construction of specified roads would not be recoverable by plaintiff by way of purchaser credit.[10] Finally, it also knew (or is charged with knowing) that nothing in the contract promised or suggested that Section B4.21, "Purchaser Credit", defining usable or effective purchaser credit, might be modified or ignored or supplemented simply because the estimated cost of construction of specified roads increased upon the completion of road engineering design and specification in June 1976. *See also* Part B, *infra.*

In June 1976, the Forest Service prepared and presented to plaintiff an "Agreement to Modify Contract" adding specification lists and material lists for the Big Burn contract's specified roads, and specifications for culvert pipe, underdrain, and plastic filter cloth. The Forest Service's revised estimated costs of building the specified roads (as subsequently reduced in consequence of a minor design change) were $218,331. Plaintiff executed the said agreement "without prejudice" and "under protest", and subsequently requested redesign of the specified roads so that their estimated cost would be "within the intent of the parties as stated in A–10 of the original contract." That request was promptly denied.[11]

8. Other contract provisions also indicated that appropriately adjusted changes in estimated construction costs and purchaser credit limit (but not effective purchaser credit) would be made for, among other things, "Difference in Rock Cost", "Difference in Culvert Installation", "Physical Change", and "Design Change". *See* Part B, *infra.*

9. As of June 9, 1975, plaintiff had experienced an increase in the estimated cost of construction of specified roads under another Forest Service timber sale contract involving post-engineering. Clearwater claims, however, that this was a special case not comparable to the present one.

10. Plaintiff was in fact aware in bidding that its road construction costs would be at least 10 to 20 percent in excess of the estimated costs of such construction ($166,194) prior to completion of road engineering and design, as this had been its normal history in building roads under *pre-engineered* Forest Service timber sale contracts.

11. An earlier request that the difference between the revised estimated cost of construction of specified roads and that stated in the

Plaintiff completed cutting of all of the timber included in the Big Burn sale in the spring of 1979. The actual volume of timber so cut, removed, and purchased by plaintiff was 4,010.99 MBF, or 679.01 MBF less than the estimated volume of timber (4,690 MBF) contained in the Big Burn contract.

Plaintiff earned a total of $218,515 in purchaser credit by construction of specified roads on the Big Burn timber sale.[12] The total effective purchaser credit, determined under Section B4.21, was $130,230.24. According to the Forest Service, "Total ineffective Purchaser Credits * * * " were $84,581.29.

## II

■ "In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 699 (1964); *see also Paccon, Inc. v. United States*, 185 Ct.Cl. 24, 31–32, 399 F.2d 162, 166–67 (1968); *Everett Plywood & Door Corp. v. United States*, 190 Ct.Cl. 80, 92, 419 F.2d 425, 431 (1969).

■ Plaintiff contends broadly that defendant committed a "breach of warranty relating to estimated cost of road construction." More specifically, it asserts that the Forest Service's estimated cost of construction of specified roads originally contained in the Big Burn contract (*i. e.*, $166,194) "constituted a representation of fact and a warranty that plaintiff was entitled to rely on" in bidding on the Big Burn timber sale, and that, defendant having "increased [plaintiff's] ineffective road credits" by

contract as executed "be paid for in cash or in an additional volume of timber charged at the same bid rate" was also denied.

12. Plaintiff's actual cost of construction of specified roads pursuant to the Big Burn contract was $248,657.

some $52,137, plaintiff is entitled to damages for breach of warranty in that amount.[13] On the facts of this case, these contentions have no merit.

Plaintiff's assertion that "[t]he right of a prospective purchaser of Forest Service timber to rely on road estimates was authoritatively settled * * * " in *Timber Investors, Inc. v. United States*, 218 Ct.Cl. ——, 587 F.2d 472 (slip op. of Nov. 15, 1978) is not entirely accurate. In any event, that decision does not justify a conclusion that Forest Service estimates of road construction costs are full warranties. While the facts in *Timber Investors* differ materially from those present here, the court there held no more than that if Forest Service road cost estimates "are shown to be unreasonably inaccurate, then defendant breached the contract * * *." *Id.*, 218 Ct.Cl. at ——, 587 F.2d at 478.

In *this* case, plaintiff was explicitly advised by the Big Burn prospectus that construction estimates for specified roads were not guaranteed, that costs or quantities shown were estimates, and that construction engineering on the Big Burn sale not only had not been completed as of June 1975, but would not be completed for more than a year thereafter. The Big Burn contract itself reiterated that the dollar amounts set forth in Section A10 were the "Estimated Costs of Specified Roads", and that the last scheduled date of completion of Forest Service construction engineering was June 30, 1976. On these facts, it cannot reasonably be concluded that the Forest Service forever warranted the originally estimated costs of road construction. *Cf., Rixon Electronics, Inc. v. United States*, 210 Ct.Cl. 309, 320, 536 F.2d 1345, 1351 (1976).

Indeed, the Big Burn contract itself indicated otherwise. It specifically provided that where road design was completed by

13. This sum is $218,331, less $166,194. Plaintiff's claim for the "reasonable value of the [road] work on the basis of *quantum meruit*" is considered hereinafter.

the Forest Service during the contract, the estimated costs and purchaser credit limit stated in Section A10 would be revised. That provision is inconsistent with any notion that the originally estimated cost of construction of specified roads was warranted as unchanging and inflexible.

In promulgating an estimate for bidding purposes, defendant is not required to be clairvoyant. *Womack v. United States*, 182 Ct.Cl. 399, 412–13, 389 F.2d 793, 801 (1968). While, under *Womack*, such an estimate must be based on all relevant information reasonably available to defendant, *id.* at 412–13, 389 Ct.Cl. at 801, plaintiff has proven no breach of such an obligation. Neither the Forest Service's original estimate of the cost of construction of specified roads, nor its revised estimate of the cost of construction of such roads following completion of construction engineering and design in 1976, has been shown to be inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made. And, it is plain that defendant did not promise or assure plaintiff that the estimated cost of construction of specified roads would forever remain $166,194. In these circumstances, plaintiff is not entitled to recover on this aspect of its claim.

Parenthetically, plaintiff's complaints about ineffective purchaser credit flow from the fact that, in the particular circumstances of this case, the maximum possible effective purchaser credit under the Big Burn contract was $153,000. The Big Burn contract contained no agreement that upon revision of the estimated cost of construction of specified roads (and purchaser credit limit), defendant would also revise the amount of *effective* purchaser credit available to plaintiff, however, and the court cannot add such a provision under the guise of a breach of a warranty defendant never made.

It is, of course, true that plaintiff experienced a larger amount of ineffective pur-

chaser credit than would have occurred had the original estimated cost of construction of specified roads proved to be an accurate prediction of the cost of construction of the specified roads as ultimately designed and engineered. On this record, however, plaintiff is not entitled to shift to defendant the burden of bearing any portion of such ineffective purchaser credit; the risks entailed were, and should remain, plaintiff's.[14]

### III

Plaintiff also asserts that the actual cutout under the Big Burn timber sale contract was some 679.01 MBF, or 14.48 percent, less than the estimated volume of 4,690 MBF stated in the Big Burn prospectus and contract, that the stated estimated volume was warranted, and that defendant is accordingly liable to plaintiff for "breach of a warranty of volume of timber * * *." Defendant does not dispute the factual components of the assertion, but vigorously, and on the facts of this case validly, denies that there was any warranty of volume of timber.

Plaintiff was explicitly informed prior to bidding, by both the prospectus and the contract, that the Big Burn timber sale volume estimates were just that: estimates, in the words of the contract "not to be construed as guarantees or limitations of the timber volumes to be designated for cutting under the terms of this contract." To hold, in these circumstances, that the Forest Service fully warranted the accuracy of the volume estimates in the prospectus and contract would do violence to the plain terms of defendant's advice to, and written agreement with, plaintiff. *Cf., Miller v. United States*, 223 Ct.Cl. ——, ——, 620 F.2d 812, 829–830.

It is, of course, true that Forest Service timber volume estimates should be carefully made, since the Service itself recognized in 1975 that a prospective purchaser should reasonably be expected to base his operating plans and cost estimates on such figures. That recognition, however, falls far

---

**14.** It is worthy of note that plaintiff made a profit of at least $80,000 on the Big Burn contract.

short of justifying the conclusion that such estimates are to be construed as warranties, in the face of contract language specifying otherwise.

In an analogous situation, the court has recently held that Forest Service estimates "so grossly erroneous as to indicate a failure to exercise reasonable care and diligence in arriving at said estimates" might give rise to governmental liability. *Timber Investors, supra,* 218 Ct.Cl. at —— n.4, 587 F.2d at 475–76 n.4. Plaintiff has, however, made no showing that defendant's volume estimates were inadequately or negligently prepared, in bad faith, or grossly or unreasonably inadequate. All that the record shows is a 14.48 percent shortfall, and that is plainly not a sufficient basis upon which to hold defendant, in the circumstances of this case, liable for any damages for breach of an alleged warranty of volume of timber.[15] *See Russell & Pugh Lumber Co. v. United States,* 154 Ct.Cl. 122, 128–29, 290 F.2d 938, 942 (1961). *Cf. Everett Plywood, supra,* 190 Ct.Cl. at 90–91, 419 F.2d at 430–31, where, on sharply different facts, a government warranty of quantity of timber was found.[16]

### IV

Plaintiff also contends that "on the basis of *quantum meruit* " it is entitled to recover the difference between its actual cost of construction of the Big Burn timber sale contract's specified roads ($248,657.54) and "the effective purchaser credits * * * that plaintiff was able to use in payment of its stumpage obligation * * * " (according to plaintiff, $133,933.71), or a total of $114,-723.83.

Plaintiff's theory is that it did not build the Big Burn contract's specified roads "under the requirements of the contract entered into on June 9, 1975", nor agree to do so "as part of its performance of the original contract." The short answer is that the theory is wholly unsound. The contract required construction of the specified roads, as designed by the Forest Service following June 9, 1975, and plaintiff's compliance with that requirement was pursuant to the plain terms and conditions of that contract. *See United States Steel Corp. v. United States,* 210 Ct.Cl. 228, 242, 536 F.2d 921, 928 (1976); *Thomas McCaffrey Co. v. United States,* 177 Ct.Cl. 387, 394–95 (1966); *National Trailer Convoy, Inc. v. United States,* 170 Ct.Cl. 823, 827–28, 345 F.2d 573, 576 (1965). Plaintiff is not entitled to recover on the basis of *quantum meruit. See, also,* Part B, *infra.*

### PART B

As already indicated, plaintiff makes two claims—one respecting increased road costs and the second for the shortfall in the amount of timber cut. On the latter the court has nothing further to add to the trial judge's opinion as adopted and supplemented in Part A, III, *supra.* This Part B discusses several arguments emphasized by plaintiff in asking us to overturn the trial judge's conclusions on the increased road costs.

The trial judge ruled that the contract, in its literal terms, did not provide any mechanism for plaintiff to recover with respect to the increase in road construction costs or the increase in ineffective purchaser credit. Clearwater Forest urges strongly before

15. Plaintiff's reliance upon a Board of Forest Appeals decision, *Homestake Mining Co.,* F.S. Docket No. 241 (issued Apr. 27, 1972) is wholly misplaced. That decision turned on improper Forest Service actions, not present here, which left little doubt that bidders had been badly misled. Plaintiff's assertion that there were "incompletely-Marked subdivisions" is not justified by the proof.

16. Our order in *McGrew Bros. Sawmill, Inc. v. United States,* Ct.Cl.No.43–78, issued July 18, 1980, does not suggest or call for a result favor-

able to plaintiff. The issue there was simply whether recovery could be had if the Government had acted unreasonably in setting the estimates, and the case was remanded for trial to determine, first, whether there was any such negligence or inadequacy, and, second, whether the contract permitted recovery even if there were such unreasonableness. The court made it very clear, however, that in no event could there be recovery if, as has been found here, there is no such showing of unreasonableness. We take the same position.

the court that (a) the contract should be read so as to grant the contractor such monetary relief through cash reimbursement for the additional road construction costs (or, alternatively, the increase of effective purchaser credits), and (b) the contract, if not so read, is invalid and therefore plaintiff can recover in *quantum meruit.* We discuss these contentions in turn.

## I

■ The plaintiff's basic contention on the interpretation of the contract is that at the time of the award to plaintiff on June 9, 1975, the roads to be built had not been designed but were to be designed by the Government within the ensuing year, and that under the contract that design had to be agreed to by the contractor. In that way plaintiff says it could protect itself against increased road costs of the kind occurring here, by refusing to agree if it did not receive further road compensation. It is of course true that the roads were not designed when the contract was awarded— what was known at that time was the general location of the roads, a preliminary layout, plus some details—but we do not concur that the contract called for plaintiff's agreement to the subsequent design before it could be effective. This was not an agreement putting off further agreement until after the post-award design was made. Instead, the contract's terms directly required plaintiff to build the roads under the design requirements laid down by the Government after the award.

Plaintiff's chief reliance is on various contract provisions calling for agreement on *revisions* or *changes* in design (and payment of additional costs),[17] but we are satisfied from the language and context of those provisions that they all related to those agreements in which the road was designed in advance of the contract (and usually included in the contract papers),[18] not to the different situation here where the design wholly succeeded the award. In this latter instance the parties envisaged, not changes or revisions in an already completed design known and agreed to in the contract award, but the making and completion of the entire design after the contract award. On that, there was no provision whatever for plaintiff's agreement or for payment of additional road costs as to the original design first created and laid down after the award by the Forest Service.[19]

■ Clearwater Forest Industries then says that, at the least, it acted reasonably in reading the contract as calling for its agreement to the post-award design of the roads, and therefore it should prevail under the familiar principle of construing a contract against the drafter. *E. g., Sturm v. United States,* 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970). But it has long been understood that this rule does not apply to a significant, patent ambiguity in the contract which the contractor should have, before entering into the agreement, taken up with the federal agency. *E. g., Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501 (1963); *Ordnance Research, Inc. v. United States,* 221 Ct.Cl. ——, ——, 609 F.2d 462, 480–81. In this case the ambiguity, if there actually was ambiguity, must and should have been patent and was undoubtedly very important. This was (as plaintiff knew) a new kind of timber sale contract calling for post-award road engineering, and a "deficit" contract at that. Plaintiff also knew that the contract allowed a definite purchaser credit against roads but that except for specified limits there was no

---

**17.** The contract articles on "Specified Roads", "Priority of Drawings", "Differences in Rock Cost", and "Design Change."

**18.** The contract provisions on which plaintiff relies were not developed specifically for the present contract (or any post-award design contract) but were apparently taken from the contract form for awards in which the design was created and specified before the award.

**19.** The contract provisions which the contractor invokes could apply to revisions and changes in (and after) the original design produced by the Government about a year after the contract award, but there are no such increased costs involved in this case. The entire claim for increased road costs concerns the original designs, not changes made thereafter.

provision for increase in effective purchaser credit if the roads proved more costly. There was, moreover, a denial of guarantee of road construction costs and a declaration that costs and quantities shown by the Government were estimates. The "deficit" character of the sale was plain and it was also plain that the roads could actually cost more to build. In the face of all this, plaintiff can rely only on a very close parsing of the terms of various previously-used [20] contract articles which could very well be applicable (as we have just held) only to design changes or revisions made *after* the initial design had been promulgated, not to this new situation of a whole design made a year or so after the award. Moreover, if plaintiff was right in thinking that it had the veto right over the post-award design (*i. e.* that the contract called for its necessary agreement if the roads were to be built), then a refusal to agree could well frustrate the whole contract a year or so after it had been awarded.[21] These circumstances should have impelled plaintiff to wonder what the proposed contract really meant;[22] the situation called for a definite inquiry to the contracting officials before the awards.[23] This was not done. Plaintiff simply went ahead and sought "to bridge the crevasse in [its] own favor." *Beacon Constr. Co., supra*, 161 Ct.Cl. at 7, 314 F.2d at 504. It cannot now say that, in any event, its interpretation (which we have held mistaken) was reasonable and accordingly should now be accepted under the rule of *contra proferentem*.

## II

Plaintiff makes three types of argument that the contract was invalid and therefore that recovery should be allowed under *quantum meruit* : (a) the contract was void for indefiniteness; (b) it violated statutory provisions; and (c) it violated Forest Service regulations. We reject each of these points:

1. The common-law contention is that the June 1975 contract was too vague and indefinite to be enforced because it required plaintiff to construct roads which were not yet designed but were to be designed after the contract was consummated. Of course, plaintiff did undertake to perform the contract and did in fact perform. Such after-the-fact claims of indefiniteness are not acceptable "where the parties knew what each of them was to do under the contract and some standard exists to measure performance." *Saul Bass & Associates v. United States*, 205 Ct.Cl. 214, 227, 505 F.2d 1386, 1394 (1974); *Sylvania Electric Products, Inc. v. United States*, 198 Ct.Cl. 106, 115, 458 F.2d 994, 999 (1972). Here, both parties indisputably intended to enter into a binding contract in June 1975. Plaintiff had had a substantial opportunity to consider the matter and, indeed, had itself asked that this sale be advertised. The parties also knew and agreed in the contract of June 1975 that the Forest Service was to design three roads during the year after the making of the contract and that thereafter Clearwater Forest Industries was to construct those roads as designed. The Government's obligation would be fulfilled when it designed the roads within the allowable year; the contractor's obligation would be performed when it built the roads thus designed. Further, though there was obviously a large factor of discretion for the design, the defendant's responsibility as to design was confined generally by the preliminary layout of where the roads would

---

20. *I. e.*, previously used in contracts in which the road engineering occurred before the award and was fully known to the contractor before he entered into the agreement.

21. The contract contained no "equitable adjustment" provision; it was at best very uncertain whether there could be arbitral or third-party determination in the absence of agreement.

22. If plaintiff had then learned the defendant's position it could have decided whether or not to accept the contract on that basis. Since it apparently made a substantial profit on the contract under defendant's interpretation (note 14, *supra*), plaintiff might still have decided to go ahead.

23. Plaintiff itself, in its argument to the court, points out several ambiguities it finds in the contract.

be located, by some other details, and by the critical fact that these were forest development roads connected with timber cutting and sales. Lastly, there was the outside requirement of reasonableness for any design. These general standards were adequate to avoid the bar against indefiniteness.

The decisions cited by the contractor as precedents are significantly different from this case. They involved suits for breach where there was no actual performance, where the parties made the consummation of a binding contract contingent on approval of plans and specifications, where there were absolutely no standards or guidelines for performance, or where the Statute of Frauds prevented proof of any sufficient standards.

2. The statutory claim of invalidity is that 16 U.S.C. § 535 (dealing with forest development roads) required the Secretary of Agriculture to amortize road costs in all timber sale contracts, and this directive was infringed by this "deficit" contract's express contemplation of ineffective purchaser credit, i. e. that the proposed sale did not anticipate recovery of expected road costs through diminution of the price to be paid by plaintiff for the timber. It is enough to say, in answer, that Section 535 does not contain the mandate plaintiff urges. All it does is to *authorize* the Department to finance road development by four separate methods, including "(2) * * * requirements on purchasers of national forest timber and other products, including provisions for amortization of road costs in contracts * * *."[24] We read this provision as allowing Agriculture to impose road costs on timber purchasers but also to amortize if the Department thought that appropriate. There is no statutory compulsion to amortize road costs, if the Secretary considers another method desirable.[25]

3. The regulations are invoked for four separate contentions that the contract was invalid. The first is that, because the roads had not been designed when the contract was awarded, the Department could not estimate the road cost, and accordingly could not find the proper appraised value of the timber to be sold—as required by the regulations, 36 C.F.R. § 221.7(a), (as well as the statute, 16 U.S.C. § 476 (now 16 U.S.C. § 472a), in advance of sale. But both the trial judge and we have found that the preliminary cost estimates for the roads were not unreasonable when made, and the regulation contemplates the use of estimates. Advance appraisal of the timber was therefore possible and adequate in this instance.

Another regulatory argument is that the regulations (if not the statute) required amortization of full road costs and excluded any ineffective purchaser credits. *See* 36 C.F.R. § 221.7(d). We do not so understand the regulation which gives authorization for effective purchaser credits but does not seem necessarily to require full amortization (and has not been so interpreted by the Forest Service).

The claim is also made that the regulations compel deduction of all road costs from the stumpage payments made by or due from the purchaser. *See* 36 C.F.R. § 221.7(c). Again, we do not understand the regulation as plaintiff does. The regulation speaks mainly to the deduction of the estimated cost of road construction from stumpage payments, adding that estimated cost of road construction may be adjusted during the life of the contract under certain circumstances. In this case, plaintiff knew

---

24. The other three methods are (a) use of appropriated funds, (b) cooperative financing with other public or private agencies, and (c) "a combination of these [four] methods * * *."

25. In 1975 Congress allowed the transfer of *effective* purchaser credits from one timber sale contract to another contract of the same purchaser (within the same forest). At that time both Committees explicitly recognized the existence of unuseable or ineffective purchaser credits, but said nothing at all to cast doubt on that practice. S.Rep.No.426, 94th Cong., 1st Sess. 4; H.R.Rep.No. 656, 94th Cong., 1st Sess. 3, *reprinted in* [1975] U.S.Code Cong. & Ad. News 1631, 1633. The statutory amendment did not concern *ineffective purchasher credits; Congress expressly limited itself to effective credits.*

from the outset that, assuming maximum escalation and a perfect cutout of timber, the terms of its own bid and of the contract were such that even the originally estimated cost of construction of specified roads could not be fully and "effectively" deducted from stumpage payments made by or due from plaintiff. More importantly, the regulation does not say, or mean, that any timber sale contract of the sort now involved that does not permit *all* of the estimated costs of construction of specified roads to be deducted from stumpage payments made by or due from the purchaser under the timber sale contract is unlawful, or gives rise to a monetary claim against the United States. It contemplates, rather, that such costs are to be deducted from such payments to the extent permitted by the terms of the contract.

Finally, the regulation, 36 C.F.R. § 221.-7(c), did not require plaintiff's agreement to the post-award road design. The directive permitted adjustments due to agreed upon *changes* during performance in existing road design but did not call for purchaser consent in this type of case in which the parties agreed in the original contract to have the road design made by the Forest Service after the award. In other words, the regulations did not provide for contractual terms different from those actually adopted. *See* Part B, I, *supra*.

For the reasons given in both Part A and Part B, *supra*, we believe that plaintiff cannot recover.

## CONCLUSION OF LAW

Upon the findings and this opinion, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.