NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CATHERINE KURKJIAN,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2020-2201

---

Appeal from the Armed Services Board of Contract Appeals in No. 61154, Administrative Judge Michael N. O'Connell, Administrative Judge J. Reid Prouty, Administrative Judge Richard Shackleford.

---

Decided: August 11, 2021

---

CATHERINE KURKJIAN, Needham, MA, pro se.

ANTONIA RAMOS SOARES, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for appellee. Also represented by JOHN V. COGHLAN, ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY; DANA J. CHASE, Contract and Fiscal Law Division, United States Army Legal Service Agency, Fort Belvoir, VA.

————————————

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges*.

PER CURIAM.

Appellant Catherine Kurkjian appeals a decision of the Armed Services Board of Contract Appeals (Board). *Catherine Kurkjian*, ASBCA No. 61154, 20-1 BCA ¶ 37,594. We *affirm*.

## BACKGROUND

### A.  Factual Background

From 1984 through 1993, Kurkjian was a full-time federal employee who worked as a food technologist and later as a technical writer at Natick Labs.  Kurkjian left federal employment in 1993.  In 2006, a former co-worker suggested that she return to work at Natick Labs as a part-time contract employee  From 2006 until 2012, Kurkjian submitted bids to perform year-long contracts for Natick Labs as a technical writer, and the government awarded her contracts for those years.

On February 28, 2012, the government awarded Kurkjian Contract No. W911QY-12-P-0194 to provide "document preparation and technical support" to the Food Engineering Services Team (FEST) at Natick Labs. *Kurkjian*, 20-1 BCA ¶ 37,594 at 182,538.  The contract consisted of a base year from February 28, 2012 to February 26, 2013, for which Kurkjian would be paid $38,110, as well as three one-year options, each with a value of $37,000.

The contract incorporated by reference several provisions of the Federal Acquisition Regulation (FAR), including FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000), which governs the exercise of options extending contract performance.  In part, FAR 52.217-9 provides:

> (a) The Government may extend the term of this contract by written notice to the Contractor within __ [insert the period of time within which the Contracting Officer may exercise the option]; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least __ days [60 days unless a different number of days is inserted] before the contract expires. The preliminary notice does not commit the Government to an extension.

48 C.F.R. § 52.217-9(a).

The contract also incorporated by reference FAR 52.212-4(l), which provides, in part:

> (l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience . . . . Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.

48 C.F.R. § 52.212-4(l).

The contract's Performance Work Statement (PWS) provided that Kurkjian was expected to work approximately 20 hours per week and to be paid $37 per hour. *Kurkjian*, 20-1 BCA ¶ 37,594 at 182,538. Among other things, Kurkjian's tasks included "convert[ing] raw technical data received from CFD [the Combat Feeding Directorate at Natick Labs] project managers/food technologists and industry into formal procurement documents." *Id*. She was also "responsible for developing the [procurement] document, coordinating with all applicable government

agencies and industry, resolving comments received from government agencies and industry, and preparing the document for final approval reviews." *Id.* Kurkjian explained that "her job was to take very technical specifications for food components of meals ready to eat (MREs) and turn them into a document suitable for the government to use in providing specifications for a procurement." *Id.*

At the beginning of the contract's performance period in 2012, Kurkjian began working on a "Nut and Fruit Mix" MRE food product. Email correspondence from July 2012 reveals there were issues involving Salmonella testing requirements for that product. Another product Kurkjian was working on—"Nut Butter and Nut Spreads"—was also the subject of email correspondence regarding Salmonella testing in July and August 2012. Email and other discussions regarding the language for Salmonella testing requirements began at that time. Kurkjian claims that she expressed repeated concerns about the safety of the products and testing protocols and did not believe her concerns were being heeded.

In September 2012, Kurkjian declined to work on a product assigned to her because it also appeared to involve Salmonella issues, whose "volatility" made them "bad for a part-time contractor, like her, to work on." *Id.* at 182,539. Kurkjian subsequently offered to work on documents about cookies, which Jill Bates, the contracting officer representative (COR), approved.

Sometime during the September to November 2012 time frame, Kurkjian convened a meeting to discuss Salmonella testing issues. According to Bates, during that meeting, Kurkjian was "screaming about things" and ultimately "walked out on the meeting." *Id.* Around that same time, Dr. Melvin Carter, who was Kurkjian's second-level supervisor, testified to having to deal with reports of Kurkjian engaging in a "shouting match" with another employee. *Id.* Dr. Carter testified that he asked Kurkjian to

get along with her co-workers, and she responded by suggesting a conspiracy to find a way to terminate her contract. She also indicated that "the office was responsible for the deaths of two former employees" due to stressful working conditions. *Id*. at 182,540. Despite these sometimes contentious exchanges, it appears that general agreement regarding Salmonella testing language for the Nut and Fruit Mix project was reached among all involved—including Kurkjian—by early December 2012. *Id* at 182,539.

On December 18, 2012, Kurkjian sent an email to Bates stating that she would "have to take back my offer to work on" the cookie project, because "the Cookie CID does not currently have Salmonella requirements." *Id*. at 182,540. She further explained that, "[a]fter what has transpired over the past year in regard to Nut and Fruit Mix, I can ill afford to put myself in a position that involves initiation of actions in regard to Salmonella testing of this new chocolate covered peanut butter candy cookie." *Id*.

On January 8, 2013, Kurkjian went to see Kathlynn Evangelos, executive assistant to Dr. Gerald Darsch, the Director of the CFD at Natick Labs. Kurkjian told Evangelos that someone had put documents on her desk and that she was concerned about it. Evangelos found Kurkjian's demeanor "disconcerting" and sent an email to Dr. Carter about the visit. *Id*. at 182,542. Later that same day, Kurkjian reiterated to Evangelos that she believed there was a conspiracy against her, and that people were "somehow taking pictures in her computer." *Id*.

Agency management convened a meeting to discuss Kurkjian's contract on January 9, 2013. In attendance were Stephen Streeter, the contracting officer (by telephone); Peter Tuttle, from the Office of Chief Counsel; Greg Wilson; Dr. Carter; Dr. Darsch; Bates; and Evangelos. At that meeting, agency management decided that the contract option would not be exercised and that Kurkjian

would be asked to stop work immediately and return her government-owned laptop, her common access card, and her keys. In the memorandum describing this meeting, Evangelos wrote that the "decision was based on the best interests of the government due to fiscal uncertainties, quality of her work, challenges with her ability to get along with CFD team members and other concerns." *Id*. Dr. Darsch rejected the option of terminating Kurkjian's contract for default because he "had no desire to give" Kurkjian any kind of "black mark" for future contracts and "wanted to end this peacefully." *Id*.

Later that same day, management met with Kurkjian and informed her that Natick Labs would not be exercising its option on her contract and that it had decided to conclude her work on the base year of the contract. The agency explained that the government would pay the remainder of the money due on her contract when she submitted a voucher for the amount owed. During that meeting, Kurkjian stated that she was being "railroaded" out of her job and that she wanted representation. *Id*. Although Kurkjian initially refused to provide information regarding the location of her government-owned laptop, she ultimately did so. Kurkjian was told to file a voucher for the remainder of the $1,702 owed to her for the base year of her contract, but she did not do so.

## B. Procedural History

On December 23, 2016, Kurkjian submitted to the contracting officer a claim under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–7109. Her claim included allegations that her email was tampered with, that the government had a "deliberate and malicious plan for [her] demise," and that she "suffered emotional distress from the government's actions." *Kurkjian*, 20-1, BCA ¶ 37,594 at 182,544. Kurkjian characterized the government's decision not to exercise the options on her contract as being made in bad faith. She sought compensation for the $1,702

remaining on her contract's base year, $37,000 for each of the three option years not exercised (totaling $112,702), "Treble Punitive Damages" of $338,106, attorney fees in the amount of $4,000, and CDA interest. Among other things, Kurkjian demanded that, "[i]f anything happens to me," the claim should be forwarded to the Inspector General. *Id.* Kurkjian added that an attorney had the file and would send her story to the media if anything happened to her.

With the exception of the $1,702 remaining on the base year of her contract, the contracting officer denied Kurkjian's claim on February 1, 2017. The contracting officer mailed a check in the amount of $1,702 to Kurkjian on March 6, 2017, but she did not cash it. Kurkjian timely appealed the contracting officer's decision to the Board.

Following a hearing, the Board denied Kurkjian's appeal on August 26, 2020. In its decision, the Board rejected Kurkjian's arguments that the government: (1) wrongfully terminated the base year of her contract; and (2) wrongfully failed to exercise its options on her contract. As to the first issue, the Board found that the government fulfilled all of its material obligations to Kurkjian under the base year of the contract because, at the time government officials informed her that they considered the contract complete, she had been paid (or at least invoiced) for all but $1,702, which meant she had completed and been paid for about 95% of the work on the contract. *Id.* at 182,545. The Board noted that the government offered to pay her the $1,702 balance and had attempted to do so. The Board further found that, even if the government had terminated the contract, and did so in bad faith, the most that Kurkjian would be entitled to would be lost profits—the $1,702 amount remaining on the base year of her contract. *Id.*

As to Kurkjian's argument that the government wrongfully failed to exercise its options on her contract, the Board found that the terms of the contract did not require the

government to exercise any of its options. The Board concluded that, as a matter of law, the government was under no obligation to exercise its contract options, and its failure to do so was not actionable unless the failure was motivated by bad faith or was arbitrary and capricious. In particular, the Board found that the government's decision not to exercise the options was due to Kurkjian's "increasingly difficult and problematic behavior, not because of her expressed concerns about Salmonella and Aflatoxin." *Id.* at 182,546. The Board found that Kurkjian had not presented clear and convincing evidence (nor even preponderant evidence) that the government had acted in bad faith, and that there was no evidence that its actions were arbitrary and capricious. *Id.* The Board therefore found no basis for Kurkjian to challenge the government's decision not to exercise the contract options.

Kurkjian timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

Under the CDA, 41 U.S.C. §§ 7101–7109, we review the Board's decisions on questions of law de novo. *Gen. Dynamics Corp. v. Panetta*, 714 F.3d 1375, 1378 (Fed. Cir. 2013). In applying de novo review, however, "we give 'careful consideration and great respect' to the Board's legal interpretations in light of its considerable experience in the field of government contracts, including its experience in interpreting the FAR." *K-Con, Inc. v. Sec'y of the Army*, 908 F.3d 719, 724 (Fed. Cir. 2018) (quoting *Fruin-Colnon Corp. v. United States*, 912 F.2d 1426, 1429 (Fed. Cir. 1990)).

We may set aside the Board's determination on a question of fact only if it is "fraudulent, arbitrary, or capricious; . . . so grossly erroneous as to necessarily imply bad faith; or . . . not supported by substantial evidence." *Gen. Dynamics Corp.*, 714 F.3d at 1378 (quoting 41 U.S.C. § 7107(b)(2)). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *E.L. Hamm & Assocs. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004).

Kurkjian's arguments on appeal can be grouped into three main categories. First, she argues that the Board erred in finding that her contract was not terminated. Second, she challenges the Board's conclusion that the government's decision not to exercise the options on her contract was permissible. Third, Kurkjian contends that the Board erred in concluding that she is not entitled to lost profits. We address each argument in turn.

First, Kurkjian contends that the Board committed legal error in concluding that her contract was not terminated. As noted, the Board found that, at the time government officials told Kurkjian that they considered the contract complete, she had been paid (or invoiced) for all but $1,702 of the amount on her $38,110 contract. *Kurkjian*, 20-1 BCA ¶ 37,594 at 182,545. In other words, she had completed and been paid for approximately 95 percent of the work on the contract. The Board noted that the government had offered to pay her the remaining $1,702, and had attempted to do so. Given these facts, the Board concluded that the government had fulfilled all of its material obligations to Kurkjian under the base year of the contract. Although Kurkjian claims that this decision was based on an "entirely new and erroneous legal principle," we disagree. Appellant's Br. 13. We see no error in the Board's conclusion that the base year of the contract was effectively complete.

Kurkjian argues that the Board erred in finding that the government was not required to issue a cure notice to her. As the Board found, however, because the government did not terminate Kurkjian's contract, no cure notice was necessary. Nor was there any need for a termination notice. As the Board explained, the contract "requir[ed] delivery of a set number of hours of work complying with the PWS for which the government would pay Mrs. Kurkjian

$37 per hour for, on average, 20 hours a week. It did not require completion of particular deliverables for payment." *Kurkjian*, 20-1 BCA ¶ 37,594 at 182,545. And, as the Board found, Kurkjian was paid for all the invoices she submitted for payment. That she failed to submit an invoice for the $1,702 remaining on the base year of her contract, and refused to cash the check from the government in that same amount, does not alter the analysis.

Next, Kurkjian challenges the Board's conclusion that the government's decision not to exercise the option on her contract was permissible and that there was no evidence of bad faith. According to Kurkjian, the Board did not consider all of the evidence of record in reaching its conclusion. As explained below, we disagree.

This court has long recognized that the government is not required to exercise an option to a contract where the contract places no restriction on the government's discretion. *See Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812–13 (Fed. Cir. 1988) (stating that, where a contract is renewable "at the option of the Government," the government is under no obligation to exercise the option). That said, "[a] contractor can recover for the government's failure to exercise an option if the government's failure was in bad faith." *Hi-Shear Tech. Corp. v. United States*, 53 Fed. Cl. 420, 436 (2002).[1]

---

[1]    The Board applied well-established case law—both from the Board itself and from the United States Court of Federal Claims—providing that "the government is under no obligation to exercise its contract options, and its failure to do so is not actionable unless the failure is motivated by bad faith or is arbitrary and capricious." *Kurkjian*, 20-1 BCA ¶ 37,594 at 182,545–46 (citing *Smart Way Trans. Serv.*, ASBCA No. 60315, 16-1 BCA ¶ 36,569 at 178,112; *Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118

Bad faith can be difficult to prove, as "government officials are presumed to discharge their duties in good faith." *Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012). To show that the government acted in bad faith, a plaintiff must demonstrate that the government acted with "some specific intent to injure the plaintiff." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoting *Kalvar Corp. v. United States*, 543 F.2d 1298, 1302 (Ct. Cl. 1976)). "Bad faith has been found when a contracting officer representative acts with specific intent to injure or the contracting officer fails to exercise independent judgment or remedy the contracting officer representative's animus, such as by removing the contracting officer representative from responsibility." *Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118–19 (2016).

Here, as the Board found, the terms of the contract "do not require the government to exercise any of its options; rather, they provide that the government 'may' do so." *Kurkjian*, 20-1 BCA ¶ 37,594 at 182,545. Indeed, Kurkjian acknowledges on appeal that "the government has the right not to exercise the option." Appellant's Br. 28. Nevertheless, Kurkjian maintains that she is entitled to recover lost profits for the three option years because, in her view, the government's decision not to exercise the option was motivated by bad faith. According to Kurkjian, the Board erred in rejecting her showing that the government acted in bad faith by retaliating against her for insisting on compliance with proper procedures for Salmonella and Aflatoxin testing.

Although the Board recognized that retaliation for insistence upon proper procedures would be an improper motivation that would "call into question the government's decision-making," it found no evidence of that motivation

(2016)). Neither party challenges application of this legal framework on appeal.

here. *Kurkjian*, 20-1 BCA ¶ 37,594 at 182,546.  Given the record, the Board found that the government declined to exercise the options due to Kurkjian's "increasingly difficult and problematic behavior"—not because of her concerns about Salmonella and Aflatoxin.  *Id.*  The Board expressly found that, while Kurkjian's supervisors "were perfectly amenable to her making efforts to comply with the appropriate testing protocols[,] they were not fine with unprofessional behavior that disrupted the office or her refusal to follow proper instructions."  *Id.*  Substantial evidence supports the Board's finding that Kurkjian failed to establish that her non-renewal was motivated by bad faith.

Although Kurkjian takes issue with the Board's reliance on testimony from Bates, Evangelos, and Dr. Carter—all of whom she refers to as "third parties to the contract"—we decline to disturb the Board's fact-findings and credibility determinations.  As we have made clear, this court may set aside the Board's determination on a question of fact only if it is "fraudulent, arbitrary, or capricious; . . . so grossly erroneous as to necessarily imply bad faith; or . . . not supported by substantial evidence."  *Gen. Dynamics Corp.*, 714 F.3d at 1378 (quoting 41 U.S.C. § 7107(b)(2)).  Though Kurkjian disagrees with the Board's factual findings, that does not, by itself, satisfy the standard for reversal.  Because Kurkjian failed to show that the Board's factual findings are arbitrary, capricious, grossly erroneous, or not supported by substantial evidence, we must defer to them.

Finally, Kurkjian contends that the Board erred in concluding that she is not entitled to lost profits for unexercised option years.  The Board found that, even if the government had terminated the contract, and had done so in bad faith, the most Kurkjian would be entitled to would be lost profits in the amount of $1,702 for the base year.  The government offered to pay that amount to Kurkjian, but she refused to accept it.  We see no error in the Board's analysis and its conclusion that, even if she had been

terminated in bad faith, Kurkjian would not be entitled to recovery beyond what she was owed for the base year on her contract. *See Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1380 (Fed. Cir. 2004) (rejecting the contractor's "contention that it should be awarded damages computed on the base year and all four option years" where only two option years had been exercised).

## CONCLUSION

We have considered Kurkjian's remaining arguments and find them unpersuasive. For the foregoing reasons, we *affirm* the Board's decision.

## **AFFIRMED**

### COSTS

No costs.